YUDKIN *v.* STATE

[No. 300, September Term, 1961.]

224

*Decided July 5, 1962.*

The cause was argued before BRUNE, C. J., and PRESCOTT, HORNEY, MARBURY and SYBERT, JJ.

*John Silard,* with whom were *Samuel B. Groner* and *Rauh & Silard* on the brief, for the appellant.

*Joseph S. Kaufman, Deputy Attorney General,* and *Robert S. Bourbon, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General,* and *Leonard T. Kardy, State's Attorney for Montgomery County,* on the brief, for the appellée.

Brief of *amici curiae* filed by *Edward de Grazia, Edward L. Genn, Benjamin Brown, Fred Weisgal, Lawrence Speiser* and *Rowland Watts* for the American Civil Liberties Union and the Maryland Civil Liberties Union.

HORNEY, J., delivered the opinion of the Court.

Claiming that the book *Tropic of Cancer,* written by Henry Miller, is neither lewd, obscene nor indecent, the defendant-appellant (Samuel Yudkin) has appealed his conviction for selling a copy of it in violation of Code (1957), Art. 27, § 418.

On October 26, 1961, two members of the Montgomery County police force entered the bookstore of the defendant in Bethesda where several copies of the alleged obscene book were on display. The officers purchased a copy and after some conversation with the bookseller, left the store to swear out a warrant for his arrest. At the time of the arrest another copy of the book was seized as additional evidence. Both copies were subsequently offered and received as exhibits.

At the trial before a jury of men and women, one of the arresting officers testified to the circumstances leading up to the arrest and prosecution of the defendant. There was also other evidence tending to show that the defendant sold the book "knowing" it to be obscene. When the defendant was asked by a newspaper reporter before the book was placed on sale if he knew he might be subject to arrest, he replied that no one had told him not to sell it. And, although he stated to the police when he sold them a copy of the book that he was not familiar with the ruling of the State's Attorney that the book was obscene, the defendant admitted on cross examination at the trial that he knew three weeks before his arrest that the employees of a drugstore in Montgomery County had been arrested for selling "under the counter paperback copies of *Tropic of Cancer."* The record further indicates that the defendant, though he had some doubt as to whether the book could be banned, chose to take the risk that a court would not declare it to be obscene. Just prior to the close of the State's case, the trial court sent the jury to the jury-room to read the book in question. But no evidence was of-

fered by the State concerning literary merit, contemporary community standards and the effect of the book with respect to prurient interest.

The defendant, who had read the book as well as critical reviews of it and apparently believed that it was not unlawful to sell the book, testified at length that in his opinion the book had literary merit and was not obscene, and stated his reasons for having the book in his possession and offering it for sale. A favorable book review, (*From Under the Counter to Front Shelf*, by Harry T. Moore, published in the *New York Times Book Review*, June 18, 1961), was also received in evidence as an exhibit. But the defendant was not permitted to offer the testimony of certain witnesses, such as professors of English literature, literary critics, authors of books, and other persons, who may have been able to qualify as experts, or to introduce as exhibits such publications as comparable books and other literary critiques and comments, to show that *Tropic of Cancer* was not obscene; that it would not arouse the prurient interest of the average person; that it had literary merit; and that it had received critical acceptance as literature. The trial court also rejected evidence that the book had been cleared by the Post Office Department for circulation through the mails and that contemporary books (such as *Memoirs of Hecate County* by Edmund Wilson, *Lolita* by Vladimir Nabokov, *By Love Possessed* by James Gould Cozzens, and *Lady Chatterley's Lover* by D. H. Lawrence) on sale generally in Montgomery County contained words and descriptions claimed to be comparable to those in *Tropic of Cancer*. Nor would the court allow the introduction of any other evidence as to contemporary community standards. Timely exceptions were taken to the exclusion of such evidence.

A special motion to dismiss the indictment as well as motions for a directed verdict, on the ground, among others, that there was no evidence that the defendant sold the book knowing it to be obscene, were also denied.

In submitting the case to the jury, the trial court, after informing the jury that it was the "sole judge of the law as well as the facts," further advised it that the question was whether the book would appeal to the prurient interests of the average

person, and that, as a jury, it was required to determine the standards of the community and to decide whether the book as a whole tended to "incite lustful thoughts." But the court refused to give an instruction that if the jury found *Tropic of Cancer* to be a "work of genuine literary intent and effect" it should acquit the defendant. Nor did the court give any other instruction indicating that literary purpose, merit or acceptance had any bearing on the offense charged or the defense to it. The jury returned a verdict of guilty and the defendant was sentenced to six months in jail.

Four questions are posed by the appeal. Inasmuch as it appears there was sufficient evidence to take the case to the jury, we find no error in the denial of the motions for a directed verdict. Of the remaining three questions, it is necessary to discuss only one of them on this appeal. This relates to the admissibility of the evidence. As to this, we think the trial court was in error when it excluded evidence proffered by the defendant to show that the book is not obscene.

The test of obscenity as laid down in *Roth v. United States* (and *Alberts v. California*), 354 U. S. 476 (1957), is "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." And, since the issue of whether the defendant was innocent or guilty necessarily involves a determination of whether *Tropic of Cancer* was in fact obscene, we think it is implicit, under the *Roth* test, that all relevant evidence (if it is otherwise competent) concerning community standards and prurient interest, as well as evidence bearing on literary merit, is admissible to show either obscenity or the lack of it.

We reaffirm the holding in *Monfred v. State,* 226 Md. 312, 173 A. 2d 173 (1961), *cert. den.* 368 U. S. 953 (1962), where there was a dearth of evidence other than the salacious material itself, that exhibits of allegedly obscene material speak for themselves and must in every case be perused and examined with care. But that is not to say—even though the court or jury (as the case may be) must in the end determine the issue of obscenity—that other competent evidence tend-

ing to show that the book is *not* obscene should be excluded as irrelevant or immaterial.

In this case where the conviction or acquittal of the defendant depended on whether or not *Tropic of Cancer* is in fact obscene, we think the defendant was prejudiced by the refusal of the trial court to permit him to offer the testimony of expert witnesses, who, had they been allowed to do so, would have testified that the book had literary merit, that it fell within contemporary community standards and that it would not stimulate lustful thoughts in the average reader. The expert opinions were admissible and should have been received. See *Harper v. Higgs*, 225 Md. 24, 169 A. 2d 661 (1961), where in restating the rule, we stated that "an approved test as to the admissibility of expert opinion is whether the jury can receive appreciable help from the particular witness on the subject, not whether the jury can decide the particular issue without expert help."

In *Smith v. California*, 361 U. S. 147 (1959), in which the conviction of the defendant for obscenity was reversed, Justice Frankfurter stated in his concurring opinion (at p. 164) that the defendant had a right "to enlighten the judgment of the tribunal, be it the jury or * * * the judge, regarding the prevailing literary and moral community standards and to do so through qualified experts" and in stating the reasons therefor went on to say that "to exclude such expert testimony is in effect to exclude as irrelevant evidence that goes to the very essence of the defense and therefore to the constitutional safeguards of due process." And Justice Harlan, in concurring with Justice Frankfurter on this point, further emphasized the view (at p. 172) that the state obscenity conviction was "fatally defective in that the trial judge * * * turned aside *every* attempt by appellant to introduce evidence bearing on community standards." Furthermore, in the A. L. I. Model Penal Code, Proposed Official Draft (May 4, 1962), § 251.4 (4), it is stated that "expert testimony, * * * relating to factors entering into the determination of the issue of obscenity, shall be admissible." And cf. *United States v. 4200 Copies International Journal*, 134 F. Supp. 490 (D. C. Distr. 1955), where women of the community were allowed to testify

as to the obscenity of the publication in question. There are other cases holding that expert testimony is admissible. See those cited by Lockhart and McClure in *The Law of Obscenity And The Constitution*, 38 Minn. L. Rev. 295, fns. pp. 348-350. See also the discussion as to the value of such testimony by the same authors in *Censorship of Obscenity: The Developing Constitutional Standards*, 45 Minn. L. Rev. 5, 95-99.[1]

As to the testimony of psychiatrists, the cases are not in accord, but if a psychiatrist can qualify as an expert witness, the admission of his testimony would not be improper. In *Smith v. California, supra,* Justice Frankfurter stated (at p. 165) that "psychological or physiological consequences of questioned literature can as a matter of fact hardly be established except through experts." But see *Womack v. United States,* 294 F. 2d 204 (D. C. Cir. 1961), where psychiatrists and psychologists were not permitted to express an opinion on contemporary community standards in a prosecution for sending obscene matter through the mails. In the latter case, however, the trial court had ruled that the witnesses were not qualified to testify as experts and the appellate court upheld the ruling.

Whether or not a witness is qualified to express an opinion on the subject as to which he is called to testify, is a matter for the trial court to pass upon in the first instance. And for a summary of what is generally necessary to qualify as an expert witness see *Turner v. State Roads Comm.,* 213 Md. 428, 431-435, 132 A. 2d 455 (1957), and the cases and authorities therein cited. See also the cases collected in 10 M.L.E., *Evidence,* §§ 281, 282.

On the question of whether other books on sale in the community were admissible for the purpose of comparing them with *Tropic of Cancer,* we think it is clear that it was error to

---

1. Compare the two cases of *Harman v. Morris* (decided February 21, 1962, by the Superior Court of Cook County, Illinois) and *Commonwealth v. Robin* (decided April 17, 1962, by the Court of Common Pleas No. 2 in the County of Philadelphia, Pennsylvania), which, though reaching opposite results as to the obscenity of *Tropic of Cancer,* permitted the introduction of expert testimony.

reject them. The necessity of admitting such evidence was pointed out by Justice Harlan in *Smith v. California, supra,* when he stated (at p. 171) that "[t]he community cannot, where liberty of speech and press are at issue, condemn that which it generally tolerates." And because the trier of the facts is required under the *Roth* obscenity test to apply "contemporary community standards" in determining what is and what is not obscene, it is essential that the jury or court, instead of being required to depend on what may well be a limited knowledge of the moral and literary standards of the community, has a right to read, or to be informed of, the contents of comparable books that have been generally accepted or tolerated by the public.

Recently the Supreme Court of California in *In re Harris,* 366 P. 2d 305 (Cal. 1961), ruled that evidence consisting of "expert testimony, comparable writings and pictures adjudged * * * not to be obscene, and comparable writings and publications purchased in the community" was admissible in a prosecution for selling allegedly obscene books in violation of the California obscenity statute.

It was therefore not only error to reject the comparable books as evidence, but the court also erred when it refused to permit introduction of evidence showing that the Post Office Department had determined that *Tropic of Cancer* was mailable. And, since the record shows that the "study" or critique of the book made by George Orwell, the novelist and critic, was offered as evidence of its literary merit, and not, as the State assumes, as evidence of "community acceptance or standards," it is apparent that the trial court also erred when it refused to admit the critique as evidence.

For the reasons herein stated the judgment will be reversed and the case remanded for a new trial, but in reaching this decision, we should not be understood as expressing any opinion as to whether *Tropic of Cancer* is or is not obscene.

*Judgment reversed and case remanded for a new trial; the costs of this appeal to be paid by Montgomery County.*